UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
MICHELLE SOSO,

|  |  |  |
|---|---|---|
| | Plaintiff, | **COMPLAINT** |
| -against- | | Docket No.: 21-CV-4660 |
| THE NEW YORK CITY DEPARTMENT OF EDUCATION and HAILE SELASSIE (individually and in his official capacities), | | Jury Trial Demanded |
| | Defendants. | |

----------------------------------------------------------------------X

Plaintiff, MICHELLE SOSO, by and through her attorneys, RICOTTA & MARKS, P.C.,

complaining of Defendants herein, alleges, upon knowledge as to herself and her own actions, and

upon information and belief as to all other matters, as follows:

## JURISDICTION AND VENUE

1.      This action is brought pursuant to 42 U.S.C. § 1983 to redress the discrimination
against Plaintiff in the terms, conditions, and privileges of her employment, as well
as the deprivation by Defendants, under the policies, ordinances, custom and usage
of all rights, privileges and immunities secured to Plaintiff by the Fourteenth
Amendment to the Constitution of the United States and all of the laws and statutes
thereunder.   This action also arises under the New York State Executive Law,
Human Rights Law, Section 290 *et seq.*; the New York City Administrative Code
§ 8-101 *et seq.*, and any other cause of action which can be inferred from the facts
set forth herein.

1

2.      The jurisdiction of this Court is invoked under 28 U.S.C. § 1331, the doctrine of pendant jurisdiction and the aforementioned statutory and constitutional provisions.

3.      Venue is proper pursuant to 28 U.S.C. § 1391.

4.      All conditions precedent to maintaining this action have been fulfilled.   On August 24, 2020, a Notice of Claim was served upon the DOE.   The DOE has acknowledged receipt of same.   Moreover, a charge of discrimination was filed with the Equal Employment Opportunity Commission ("EEOC").   A right to sue letter has not yet been received, to date, but upon receipt, Plaintiff will seek to amend this complaint to add claims under the same facts pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000-e, *et seq.*

## PARTIES

5.      At all times hereinafter mentioned, Plaintiff Michelle Soso ("Soso") was and still is a resident of the County of Queens, State of New York.

6.      Defendant, New York City Department of Education ("DOE"), was and still is a municipal entity located at 52 Chambers Street, New York, NY 10007.

7.      Defendant, Haile Selassie ("Selassie"), a teacher with the New York City Department of Education, at all relevant times, aided, abetted, compelled and/or incited the unlawful treatment set forth below.

## FACTS

2

8.      On or about May 16, 2005, Michelle Soso ("Soso") began her employment with the New York City Department of Education ("DOE") as a temporary clerical employee.   On or about January 31, 2006, Soso was hired by the DOE in a full-time position as a purchasing secretary. On or about July 24, 2016, Soso was hired by the DOE as a full time attendance teacher, assigned to District 29.

9.      At all times, Soso performed her job duties in an exemplary fashion.   As a result of her job performance, on or about July 1, 2009 the DOE granted pedagogue tenure to Soso as School Secretary and on July 1, 2019, the DOE granted pedagogue tenure to Soso as Attendance Teacher.

10.     On or about September 22, 2018, Soso was raped by another attendance teacher Haile Selassie ("Selassie").

11.     On or about October 22, 2018, Soso reported the assault to Anthony Vellon ("Vellon"), Attendance Supervisor, Queens South, D27, 28, 29, 31.   Soso did not tell Vellon Selassie's name because was still coming to grips with her assault. Vellon told Soso that until she decides whether or not to make a formal complaint and provide Selassie's name, she does not have to come to monthly meetings.

12.     On or about October 26, 2018, Soso reported the sexual assault to Nirmala Bhimsen ("Bhimsen") DOE's Office of Equal Opportunity ("OEO").   As with Vellon, Soso did not tell Bhimsen Selassie's name because was still coming to grips with her

assault.   Bhimsen advised Soso that unless and until she provides the name of the individual who sexually assaulted her, OEO will not start an investigation.

13.     On or about November 9, 2019, Bhimsen called Soso regarding her complaint to OEO.  Bhimsen asked Soso if she decided to provide the name of her assaulter. Soso advised Bhimsen that she was still coming to grips with her assault and that she was hoping she would be ready to go forward after Christmas break.

14.     On or about December 17, 2018, while Soso was in the DOE Central Office, Selassie physically assaulted Soso, grabbing her and pulling Soso into a doorway after she refused to speak with him, in front of witnesses, including Jenella Pridgen, Assistant to the Attendance Teacher supervisor and Vellon.

15.     That same day, Soso reported to Vellon that she was assaulted in the office by Selassie and also that he was the individual who sexually assaulted her.   Vellon said he would follow protocol for DOE reporting and took a statement from Soso.

16.     On or about December 20, 2018, OEO contacted Soso and advised her that they had opened a case based on her complaint and would start an investigation.

17.     On or about January 4, 2019, OEO opened the case and assigned investigator Cody Mitchell ("Mitchell") to handle the investigation.

18.     On or about March 21, 2019, Soso, and the other attendance teachers were scheduled for a training.  Vellon informed Soso that if she wanted to go, they

would not permit Selassie to attend.   Soso told Vellon that she will be attending the training.

19.   Despite Vellon's assurances, and the open OEO investigation, Selassie appeared at the March 21 training, and the DOE allowed him to attend.   After the training, DOE Department Director Rachel Lewis ("Lewis"), advised Soso that Selassie was staring at her during the entire training and that Selassie's actions and demeanor were "not good."   Lewis insisted on escorting Soso to the parking lot, and Selassie's behavior was so inappropriate that Lewis recommended that Soso get an order of protection, which she attempted to do.

20.   That same day, Soso went to the Nassau County Police Department to complete a report regarding Selassie's rape.   Soso provided both Vellon and Mitchell a copy of the report.

21.   On or about March 29, 2019, Lewis requested Soso appear for a meeting regarding an update on her complaints.   Soso advised Lewis that she still had not been interviewed by OEO, months after making her complaint.   Lewis requested that an attorney for DOE legal attend the meeting.   The attorney informed Soso that because the rape occurred off DOE property it was not a DOE matter.

22.   On or about April 4, 2019, Soso was granted a temporary order of protection against Selassie.   Soso gave copies of the order to Vellon and Mitchell.

23.     On or about April 16, 2019, Selassie, went to court in Nassau County requesting an order of protection from Soso, falsely claiming she was the one threatening him and not the other way.   Based upon Selassie's false testimony, the court issued Selassie a temporary order of protection.

24.     On or about April 30, 2019, Mitchell finally interviewed Soso regarding her complaint.   After the interview, Mitchell asked Soso to keep him informed regarding the order of protection.

25.     On or about May 6, 2019, Selassie attempted to have an order of protection he received under false pretenses served by the Sheriff on Soso at her work site in an effort to embarrass Soso and potentially have her terminated.   Soso told both Vellon and Mitchell about Selassie's order of protection and how it was obtained under false pretenses.

26.     On or about May 31, 2019, Soso was teaching after school chess at P.S. 131. While teaching, Principal Veronica DePaolo ("DePaolo") came into Soso's class. DePaolo told Soso not to be alarmed but two (2) investigators from DOE's Office of Special Investigations ("OSI") wanted to speak with Soso.   DePaolo said that she would supervise Soso's class (in which Soso's son was co-teaching) while Soso spoke with the OSI investigators in another classroom.

27.     Soso then met with the OSI investigators, Robert LaRocco ("LaRocco") and another investigator who did not provide his name.   The investigators informed

Soso that OSI received an anonymous complaint through 311 that Soso was posting nude pictures of herself to her elementary age students and that had dated several of the fathers of her students.   As Soso explained, both of these allegations were completely and utterly false.   The investigators then asked if Soso has any enemies who could be making these unfounded allegations.   After mentioning a parent of a student who was an issue but she did not think that was the person.   The investigators asked if there was anyone else who would make a false complaint against Soso.   Soso explained the rape and harassment by Selassie.   When she mentioned his name LaRocco said that he was exactly who they thought she would say.   The investigators explained that they had been investigating Soso for a while at this point and that they did not think the allegations against her were founded. As such, DOE knew that Selassie continued to harass Soso but took no action to discipline him or stop the harassment.   As the investigators were leaving, the unnamed investigator advised Soso that, "Selassie has a lot of pots in the fire."

28.   Following Soso's interview with OSI DePaolo explained that she had been interviewed in connection with Selassie's complaint and she knew it was false.

29.   On or about June 1, 2019, Soso's landlord told her that a man came to her apartment looking for her but did not identify himself.   Soso showed her landlord a picture of Selassie and she confirmed that he was the person who came looking for her. Soso advised LaRocco, Vellon, and Mitchell of this incident and provided them with a copy of the police report she obtained.

7

30.     On or about June 3, 2019, Soso went to family court to file a complaint about Selassie's violation of the order of protection based on his June 1 incident.   Again, Soso sent copies of all of the pertinent paperwork to LaRocco, Vellon, and Mitchell.

31.     On or about June 4, 2019, Soso attended mediation in Nassau County Family Court, based on Selassie's order of protection, which was obtained under false pretenses. The mediator explained that the judge was aware of the order of protection that Soso obtained in Queens and that the simple solution is to either have mutual orders of protection or to drop them.   Soso explained that she needed an order of protection based upon Selassie's threated to kill her and his harassment both inside and outside of work.   Selassie claimed that he needed an order of protection because he wanted to get Soso fired because he felt one (1) of them would be terminated and she was not tenured, and he was.   The matter was adjourned, and Soso advised LaRocco, Vellon, and Mitchell of what happened at court.

32.     On or about June 7, 2019, Soso was contacted by Detective Reintin of the Nassau County Police Department, Fifth Precinct.   Reintin explained that Selassie filed a report (falsely) claiming that Soso had threatened to kill him and his girlfriend and "begged" them to arrest Soso.   Soso explained to Reintin what was happening, and Reintin asked Soso to come to the precinct with her phone.   A few days later, Soso went to the precinct and showed an officer on duty both her phone and her phone records, evidencing that she had not contacted Selassie and certainly had not threatened him.

33.    On or about June 14, 2019, Reintin contacted Soso and informed her that they were closing the case against her, because Selassie failed to bring in his phone or any records to establish that Soso had threatened him.   That same day, Soso emailed LaRocco, Vellon, and Mitchell of the false threats that Selassie made against her and that she feared for her safety.   None of them ever responded, and still no action was taken against Selassie.

34.    Throughout July and August 2019, Soso went to court regularly regarding the harassment by Selassie.   At all times she kept advised LaRocco, Vellon, and Mitchell advised as to the status of these matters and of Selassie's harassment.

35.    On or about September 4, 2019, while at work, Soso met with Vellon to provide an update regarding the cases with Selassie.   Vellon advised Soso to continue to record and submit documentation to payroll secretary with respect to days she could not come to work due to court cases with Selassie.   Vellon also told Soso that she was performing excellent work and that she should continue to do what she was doing from a work perspective.

36.    On or about September 25, 2019, Rachelle Lewis ("Lewis") (Queens South BCO, Director of Student Services) told Soso that she was attending a community school meeting with Principal Leddy and would pass by her office afterwards to speak. Principal Leddy's secretary called Soso to the office because Lewis wanted to speak with her.   When Soso arrived at the conference room, Lewis said that she did not call Soso into the room.   Principal Leddy said he had Soso called when Lewis said

9

she wanted to speak with her.   Lewis laughed and said he misunderstood.   Lewis said she was wanted to see if that day at 11 was still the weekly Attendance meeting time because she would not mind attending "since she was already there".

37.   At the meeting Lewis asked Soso for the agenda and sign-in sheet.   As Soso explained, the meeting is run by the Assistant Principal so she does not have the agenda or sign-in sheet.   Despite this, Lewis insinuated that Soso was unprepared for her job.

38.   After the meeting Lewis told Soso to walk her out to her car.   Lewis asked about the court case and the OEO complaint.   Soso responded that it was difficult but hoped to have everything resolved soon.   Rather than support Soso, Lewis then said "You should get some therapy and deal with your stuff before it interferes with your job."   When Soso asked what Lewis meant, she responded that Leddy was complaining that Soso seemed "too scared to talk" with him.    As Lewis was leaving she again told Soso to "get some help for your stuff".

39.   On or about October 1, 2019, Nassau County Police finally arrested Selassie, but for filing false reports against, not the rape of Soso.   A little over a week later, Soso advised Vellon of Selassie's arrest, the order of protection that was granted to Soso and provided him the docket number.   Despite this, the DOE still took no action against Selassie.

40.     On or about October 21, 2019, Soso advised LaRocco of Selassie's arrest and that she was fearful of further retaliation.   LaRocco advised Soso that OSI would not be taking any steps against Selassie and that if anything happens she should just contact the police.

41.     On or about October 25, 2019, Mitchell sent Soso a letter advising her that her that her complaint of sexual harassment against Selassie is not a violation of DOE regulations.   Soso then called Mitchell and asked whether OEO was or would investigate the assault that happened in the central office.   Mitchell told Soso that he would discuss this with his supervisor and let her know.   However, Mitchell never got back to Soso regarding this and no investigation was ever conducted with respect to the assault in the central office.

42.     On or about November 15, 2019, Soso received a 48-hour notice from OSI Investigator Christina Bunch ("Bunch"), regarding an allegation of misconduct that was filed against Soso.

43.     That same day, Soso contacted Bunch to learn what the investigation was about, as Soso had not committed any misconduct.   However, Bunch refused to provide any information about the complaint as she "does not deal directly with employees."

44.     On or about December 12, 2019, Soso met with Bunch with her union representative.   During the meeting Bunch informed Soso that OSI received an anonymous complaint that Soso had stolen time from the DOE on numerous days,

11

16 in total, during the school year.   Soso immediately knew that this "anonymous" complaint was made by Selassie, continuing his attempts to have Soso disciplined and fired for complaining about his rape.   Soso, after reviewing her date book, asked Bunch if the dates in which it was alleged that she stole time coincided with the dates that she was required either to appear in court, or appointments and interviews with the police due to Selassie's actions, both in attempting to get her own order of protection and his false allegations against Soso.   Bunch confirmed that the dates were all the same.   Soso explained the situation and that for every single date, she advised Vellon of each and every date.   She further explained to Bunch that Vellon, after conferring with human resources and receiving no real guidance from them, advised Soso that she had permission to attend any appointment necessary related to this matter as long as she documented it on her timesheet.   Vellon explained to Soso that when these legal matters with Selassie were resolved, the DOE would determine how to account for the days she was required to go to court.   Soso showed Bunch documentation to substantiate that on each of the dates in question she was either in court or with the police, all related to Selassie.   Bunch admitted that there was no evidence that Soso was stealing time based upon the documentation Soso showed her.

45.     On or about December 16, 2019, Soso was advised by the Nassau County District Attorney's Office that Selassie pled guilty to stalking Soso.   As a result of this plea, the judge in the matter issued a two (2) year order of protection, but it allowed

for incidental contact related to work, despite the fact that Selassie assaulted Soso in the DOE Central Office.

46.     That same day, Soso emailed a copy of the order of protection to Vellon, Mitchell and LaRocco.   Vellon asked Soso if she was sure there was an arrest and plea in the matter, because Selassie had not notified the DOE of any of this.   Despite Selassie's rape, assault, and stalking of Soso, his abuse of the DOE complaint system to retaliate against Soso, Selassie's guilty plea and his failure to advise the DOE of his criminal case and plea, the DOE took no action against Selassie or to protect Soso.

47.     On or about January 8, 2020, Vellon advised Soso that for the first time OEO was investigating at least some of the offenses that Selassie committed.   However, Vellon had to recuse himself from heading the investigation because Selassie filed a complaint against him in order to have the complaint heard by Lewis.   Selassie had previously told Soso that he was close with Lewis and that she would always help him.   Soso expressed these reservations to Vellon, yet Lewis was still in charge of the investigation.

48.     On or about January 29, 2020, Lewis advised Soso that she was conducting the investigation into Selassie and wanted to speak with her.   Soso informed Lewis that she was not comfortable with Lewis leading the investigation based upon Selassie's comments.   Soso asked Lewis to have another staff member head the

investigation.   However, Lewis failed to respond to Soso and did not contact her for an interview.

49.   After not hearing from anyone further with respect to the investigation into Selassie, Soso, on the advice of a co-worker emailed Marele Wilkes ("Wilkes"), Executive Director of the Borough Support Office to ask to discuss the investigation.   Rather than assist Soso, Wilkes responded curtly asking "[w]ho told you to contact me?"

50.   That same day, Soso asked Vellon for advice as to how to proceed and Vellon said that he would get back to her.   Soso also advised Vellon that she had not received any information regarding her certification for her position at the DOE.   Vellon informed Soso that this was strange and that she should have received at least two (2) letters regarding certification since September.

51.   When Soso received her paycheck at the end of January, she noticed that days that she needed to be in court or with the police had been deducted from her paycheck. She first asked the payroll secretary who told Soso that she was just doing what she was told.   She asked Vellon about the deductions and he claimed that he had no knowledge of the deductions or the reasons and advised that Soso call Bunch. When Soso called Bunch, Bunch responded that she would not talk to Soso, only her union representative.   Soso's union representative contacted Bunch on multiple occasions, but Bunch refused to respond.

14

52.     On or about February 27, 2020, the DOE Certification Unit emailed Soso informing her that she was scheduled to be terminated due to an expired certificate, because she had not completed her masters degree.   However, Soso would have completed her masters degree during the time allotted but for Selassie's actions and the DOE's failure to provide a safe environment to work.   The emotional damage to Soso as a result of these events prevented her from completing her masters on time.   Soso left a voicemail on the phone number provided in the email as instructed. However, no one ever responded to Soso's message.

53.     On or about March 3, 2020, Soso spoke with someone named Charles at the UFT help line.   Charles informed Soso that the only person at the Doe who can grant an extension of time was Charles Peeples ("Peeples") in the DOE Certification Unit.

54.     On or about March 11, 2020, Soso spoke with an individual in the DOE Certification Unit.   This person, after hearing Soso explain what had happened, said that Soso should be eligible for an extension of time to complete her masters, but that the final decision was to be made by Director Valerie Fallon ("Fallon"). This individual informed Soso that she would inform Fallon of Soso's situation when she returned from a meeting and that Soso should expect a call the next day. However, Fallon never called Soso.

55.     On or about May 12, 2020, Soso emailed Fallon regarding the conversation on March 11.   Fallon responded to this email saying that she would review Soso's case and let Soso know her decision.

56. On or about May 14, 2020, the DOE sent Soso another letter advising her that she might be terminated effective July 1, 2020 due to the certification issue.

57. On or about May 21, 2020, Soso wrote Fallon to inform her that the NYS Teach system in was closed indefinitely due to the pandemic.   Moreover, Soso was informed that the wait time was a minimum of 16 – 24 weeks to review requests for extensions due to certification issues.   The Board of Regents expressed on the site that Districts and administration needed to make decisions based on best practices to give students the best educational support at this time of national crisis. Extensions would be given to those with expiring certificates and reviewed as the pandemic progressed.   Soso requested to Fallon that based upon this guidance, coupled with the sexual harassment and retaliation that Soso experienced (both on and off DOE property), and Soso's 15 year exemplary employment performance, for consideration of an extension to the current DOE grace period for Soso to complete her certification.

58. On or about June 9, 2020, Fallon replied to Soso's letter requesting her review of her circumstances and Soso's request for an extension of time to complete her Master's degree for her certification.   Despite the fact that this request was necessitated by the sexual harassment and retaliation that Soso suffered for reporting same, Fallon denied Soso's request and stated that she would be terminated July 1, 2020.

59.     On about June 23, 2020, after the last staff meeting of the year, Soso told Vellon

that she was going to be forced to resign from her position as Attendance Teacher

because DOE certification would not give an extension of grace period for my

certificate and Attendance was not a subject that allowed for study sabbaticals. Soso

also told him that she was rescinding her School Secretary resignation to return to

work in 20-21.   Vellon told Soso that she could not resign as AT and take a

Secretary job because she was being terminated and that if she resigned as an

Attendance Teacher she would not be eligible to work as a job as a Secretary.

Vellon told Soso that she should not resign yet due to the unknowns with Covid.

He said the DOE may continue grace periods for the short-list of employees with

certification issues that had good work records and tenure, such as Soso.

60.     On or about June 24, 2020, Soso emailed Fallon and Peeples asking about her status

for the next school year.   Peeples replied to Soso's email asking Fallon to answer

Soso's question.   However, Fallon never responded.

61.     On or about June 26, 2020, the last reporting day for teachers, Soso still had not

received a termination letter nor any correspondence from the Certification office.

62.     On or about July 16, 2020, Soso was working a summer per session presenting at a

remote learning professional development for 29Q289.   Soso's DOE Microsoft

account denied her access.   That same moment, she received an email on her

personal email from Fallon terminating my work with the DOE effective July 1,

2020, presumably due to the certification issue.   Similar teachers who were not

17

sexually harassed by fellow teachers and/or did not report sexual harassment and retaliation were granted an extension for their certification.

63.    On or about July 21, 2020, Vellon called Soso and said that the list of terminated Attendance Teachers was short.   All of the others had written to the Chancellor's office when they got their letters asking to be rehired for SY20-21 and they were all rehired the next day, except for Soso.   Soso asked Vellon if the District had submitted documentation to NYS Board of Regents for her 3020 appeal.   Vellon said that Soso was not entitled to a 3020 because that was only for tenured teachers. Soso reminded Vellon that she was tenured by Supt. Mitchell in 2019. Vellon said 3020 still didn't apply because the DOE has cause to terminate based on expired certification.

64.    On or about July 24, 2020, Soso wrote to Chancellor Carranza asking that he reconsider her termination.   There was no acknowledgement or response.

65.    On or about August 25, 2020, after attending the Chancellor's August 19 meeting, Soso forwarded her July request to the new Deputy Chancellor, D. Conyers for review, noting that other colleagues with the identical certification issue were rehired.   Within hours human resources responded that Soso was terminated due to her certification issue, despite the fact that other employees, with similar certification issues, but who were not sexually harassed and did not report sexual harassment, were granted continued employment.

18

66.    Soso forwarded the response from human resources to the Deputy Chancellor, explaining that she was prevented from completing her studies because of the sexual harassment and retaliation related to Selassie, who was still employed despite being arrested and pleading guilty for stalking and harassing Soso. There was no acknowledgement or response to Soso's email.

67.    On or about September 2, 2020, Soso received Vellon's memo to staff about assignments for the upcoming school year, despite being terminated.   Selassie was listed as approved for remote work assignments, therefore still employed by DOE.

68.    Based on the foregoing, Soso has been subjected to adverse employment actions, a hostile work environment, and/or an atmosphere of adverse employment actions by Respondent due to her gender, sexual harassment, and/or in retaliation for her prior complaints of discrimination in violation of her Fourteenth Amendment rights, Title VII, as well as all applicable state, city, and local laws.

## CLAIMS FOR RELIEF

69.    Plaintiff has been subjected to a hostile work environment, and/or adverse employment actions, as well as an atmosphere of adverse employment actions based on her sex/gender and/or in retaliation for her opposition to discriminatory practices.   Defendant DOE's actions are in violation of the New York State Executive Law, the Human Rights Law, §290, *et seq.*; and the New York City Administrative Code § 8-101 *et seq.*

70.     Defendant DOE has, while acting under color of state law, deprived Plaintiff of her

constitutional rights, as secured by the Fourteenth Amendment to the United States

Constitution, in violation of 42 U.S.C. § 1983, and all related provisions of the New

York State Constitution.   The DOE and the DOE's supervisors have intentionally

committed, condoned or were deliberately indifferent to the aforementioned

violations of Plaintiff's constitutional rights.   Such deliberate indifference may be

inferred in the following ways:

a.      The DOE's custom or practice of discriminating against and/or harassing
        Plaintiff based on her sex/gender.   The discriminatory and retaliatory
        practices were so persistent and widespread that they constitute the
        constructive acquiescence of policymakers.

b.      Supervisors failed to properly investigate and address allegations of
        harassment and/or discrimination.

c.      Inadequate training/supervision was so likely to result in the harassment,
        and/or discrimination that policymakers can reasonably be said to have been
        deliberately indifferent to the need to provide better training and
        supervision.

d.      Policymakers engaged in and/or tacitly condoned the harassment and/or
        discrimination.

47.     The individual Defendant unlawfully participated in and/or permitted the

aforementioned unlawful conduct to perpetuate, without abatement, in violation of

Plaintiff's constitutional and statutory rights pursuant to 42 U.S.C. § 1983.

48.     The individual Defendant, aided, abetted, incited, compelled and/or coerced the

aforementioned unlawful conduct in violation of New York State Executive Law,

Human Rights Law § 296(6) and the New York City Administrative Code § 8-107.

20

49.     By reason of Defendants' violation of Plaintiff's rights, Plaintiff has suffered a loss of monetary benefits associated with her employment, in addition to suffering physical, emotional and other damages.


WHEREFORE, Plaintiff demands judgment against Defendants for all compensatory, emotional, physical, and punitive damages (against the individual defendant only), lost pay, front pay, injunctive relief, and any other damages permitted by law.   It is further requested that this Court grant reasonable attorneys' fees and the costs and disbursements of this action and any other relief to which Plaintiff is entitled.   Plaintiff demands a trial by jury.

Dated: Long Island City, New York
       August 18, 2021

RICOTTA & MARKS, P.C.
*Attorneys for Plaintiff*
24-11 41st Avenue, Second Floor
Long Island City, New York 10001
(347) 464-8694

_____/s_____
THOMAS RICOTTA (TR-1900)

21