UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

MICHELLE SOSO,

                          Plaintiff,

          v.

THE NEW YORK CITY DEPARTMENT OF
EDUCATION and HAILE SELASSIE (in his
individual and official capacities),

                        Defendants.

**MEMORANDUM AND ORDER**
2:21-CV-4660 (LDH) (TAM)

---

LaSHANN DeARCY HALL, United States District Judge:

Michelle Soso ("Plaintiff") brings this action against New York City Department of Education ("NYCDOE") and Haile Selassie (together with NYCDOE, "Defendants") pursuant to 42 U.S.C. § 1983, the New York State Human Rights Law ("NYSHL") § 290 *et seq.*, and the New York City Human Rights Law ("NYCHRL") § 8-101 *et seq.*, alleging hostile work environment and retaliation. Defendants each move pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the complaint in its entirety.

## BACKGROUND[1]

Plaintiff was employed by NYCDOE from January 31, 2006, to July 1, 2020. (Am. Compl. ¶¶ 8, 62, ECF No. 18.) She started as a purchasing secretary, but became an attendance teacher on or about July 24, 2016. (*Id.* ¶ 8.) Plaintiff obtained pedagogue tenure in that role on July 1, 2019. (*Id.* ¶ 9.) Selassie was also an attendance teacher. (*Id.* ¶ 10.)

On or about September 22, 2018, Plaintiff was raped by Selassie. (*Id.*) On October 22, 2018, Plaintiff reported the rape to the Attendance Supervisor, Anthony Vellon, but she did not

---

[1] The following facts taken from the amended complaint (ECF No. 18) are assumed to be true for the purpose of this memorandum and order.

identify Selassie because she "was still coming to grips with her assault." (*Id.* ¶ 11.) In response, Vellon advised Plaintiff that until she decided whether or not to make a formal complaint and provide her assailant's name, she did not have to attend monthly meetings. (*Id.*) On October 26, 2018, Plaintiff reported the rape to NYCDOE's Office of Equal Opportunity ("OEO"), Nirmala Bhimsen, but again did not identify Selassie by name. (*Id.* ¶ 12.) Bhimsen advised Plaintiff that OEO would not initiate an investigation unless Plaintiff identified her rapist. (*Id.*) Bhimsen followed up with Plaintiff on November 9, 2018, asking if Plaintiff decided to identify her assaulter. (*Id.* ¶ 13.) Plaintiff declined to do so, but hoped that she would be ready in the new year. (*Id.*)

On December 17, 2018, while Plaintiff was in the NYCDOE Central Office, Selassie physically assaulted Plaintiff by "grabbing her and pulling [her] into a doorway after she refused to speak with him." (*Id.* ¶ 14.) Plaintiff reported to Vellon that Selassie had assaulted her, and for the first time, identified Selassie as her rapist. (*Id.* ¶ 15.) Vellon took a statement from Plaintiff. (*Id.*) On December 20, 2018, OEO contacted Plaintiff and advised that it would begin an investigation. (*Id.* ¶ 16.) On January 4, 2019, Cody Mitchell was assigned to conduct the investigation. (*Id.* ¶ 17.)

On March 21, 2019, Plaintiff and other attendance teachers were scheduled to attend a training. (*Id.* ¶ 18.) Vellon advised Plaintiff that if she wanted to attend the training, Selassie would not be permitted to attend. (*Id.*) Plaintiff advised Vellon that she would attend the training. (*Id.*) Despite Plaintiff's attendance, Selassie still attended the training. (*Id.* ¶ 19.) NYCDOE Department Director Rachel Lewis advised Plaintiff after the training that Selassie stared at Plaintiff during the entire training and that Selassie's "actions and demeanor were not good." (*Id.*) Lewis "insisted on escorting [Plaintiff] to the parking lot," and Lewis

recommended that Plaintiff obtain an order of protection. (*Id.*) Plaintiff went to the Nassau County Police Department the same day to report Selassie. (*Id.* ¶ 20.) Plaintiff provided Vellon and Mitchell with a copy of the police report. (*Id.*)

On March 29, 2019, in a meeting between Lewis, Plaintiff, and an NYCDOE attorney, Plaintiff advised Lewis that she had not yet been interviewed by OEO. (*Id.* ¶ 21.) The NYCDOE attorney advised Plaintiff that "because the rape occurred off [NYCDOE] property it was not a [NYCDOE] matter." (*Id.*)

In April 2019, Plaintiff and Selassie were each granted a temporary order of protection against the other. (*Id.* ¶¶ 22, 23.) Plaintiff provided copies of her temporary order of protection to Vellon and Mitchell. (*Id.*) On May 6, 2019, Selassie attempted to have his order of protection served on Plaintiff while she was at work. (*Id.* ¶ 25.) Plaintiff advised Vellon and Mitchell of Selassie's order of protection, and her belief that Selassie obtained it under false pretenses. (*Id.*)

On May 31, 2019, two investigators from NYCDOE's Office of Special Investigations ("OSI") interrupted Plaintiff's class to speak with her concerning an anonymous complaint that accused Plaintiff of "posting nude pictures of herself to her elementary age students," and of dating several fathers of her students. (*Id.* ¶¶ 26, 27.) Plaintiff disputed the allegations, explained her conflict with Selassie, and surmised that the false complaint could have been made by him. (*Id.* at 27.) Upon hearing Selassie's name, one investigator responded that that "was exactly who they thought she would say." (*Id.*) The investigators advised Plaintiff that they had been investigating her "for a while" and did not believe the allegations were founded. (*Id.*) The investigators "acknowledged that Selassie made this complaint to retaliate" against Plaintiff and advised Plaintiff that Selassie "ha[d] a lot of pots in the fire." (*Id.*)

On June 1, 2019, Plaintiff was advised by her landlord that a man came to her apartment

looking for her, but the man did not identify himself. (*Id.* ¶ 29.) Plaintiff showed her landlord a picture of Selassie and the landlord confirmed that Selassie was the man who came to Plaintiff's apartment. (*Id.*) Plaintiff advised OSI, OEO, and Vellon, and provided them a copy of the police report she obtained. (*Id.*)

On June 3, 2019, Plaintiff filed a complaint in family court concerning Selassie's violation of her order of protection against him. (*Id.* ¶ 30.) The next day, Plaintiff attended mediation with Selassie in family court, arguing that she needed an order of protection based upon Selassie's threat to kill her and his harassment both inside and outside of work. (*Id.* ¶ 31.) Selassie also sought an order of protection against Plaintiff, which she surmised was "because he wanted to get [Plaintiff] fired because he felt one [] of them would be terminated and she was not tenured, and he was." (*Id.*) After the matter was adjourned, Plaintiff advised OSI, OEO, and Vellon what occurred. (*Id.*)

On June 7, 2019, Detective Reintin of the Nassau County Police Department contacted Plaintiff and informed her that Selassie filed a report claiming that Plaintiff threatened to kill him and his girlfriend. (*Id.* ¶ 32.) Plaintiff explained that the threat was false and that Selassie had been harassing her. (*Id.*) After Plaintiff provided evidence that she had not contacted or threatened Selassie, Detective Reintin advised her that he would close the case because Selassie failed to establish that Plaintiff threatened him. (*Id.* ¶ 33.) Plaintiff advised OSI, OEO, and Vellon of the "false threats" that Selassie made against her and that she feared for her safety. (*Id.*) None of them responded. (*Id.*)

Throughout July and August 2019, Plaintiff went to court regularly concerning Selassie's harassment, keeping OSI, OEO, and Vellon informed of developments. (*Id.* ¶ 34.) On September 4, 2019, Vellon advised Plaintiff to continue to record and submit documentation to

4

the payroll secretary concerning days that she could not attend work due to court appearances. (*Id.* ¶ 35.)

On September 25, 2019, Plaintiff was called into a meeting with Lewis and a school principal, during which Lewis insinuated that Plaintiff was unprepared for her job. (*Id.* ¶¶ 36, 37.) Later, Lewis asked Plaintiff about her court case and OEO complaint. (*Id.* ¶ 38.) Plaintiff responded that it was difficult, to which Lewis responded, "[y]ou should get some therapy and deal with your stuff before it interferes with your job." (*Id.* ¶ 38.) Lewis stated further that the principal complained to Lewis that Plaintiff seemed "too scared to talk" with him. (*Id.*) Lewis said again that Plaintiff should "get some help for your stuff." (*Id.*)

On October 1, 2019, Selassie was arrested for filing false reports against Plaintiff. (*Id.* ¶ 39.) One week later, Plaintiff advised Vellon of Selassie's arrest and that the order of protection was granted to Plaintiff. (*Id.*) NYCDOE took no action against Selassie. (*Id.*) Plaintiff advised OSI of Selassie's arrest on October 21, 2019, and OSI responded that they would take no steps against Selassie and to contact the police if anything else occurred. (*Id.* ¶ 40.) On October 25, 2019, OEO advised Plaintiff that Selassie's conduct was not a violation of NYCDOE regulations. (*Id.* ¶ 41.)

On November 15, 2019, Plaintiff received a "48-hour notice" from an OSI investigator regarding an allegation of misconduct filed against Plaintiff. (*Id.* ¶ 42.) On December 12, 2019, Plaintiff met with OSI along with her union representative concerning the complaint. (*Id.* ¶ 44.) OSI informed Plaintiff that OSI received an anonymous complaint that Plaintiff had stolen 16 days' worth of time from NYCDOE. (*Id.*) Plaintiff reviewed her calendar and determined that she missed 16 days of work to appear in court. (*Id.*) Plaintiff explained as much to OSI, and advised that she told Vellon, her supervisor, each time she needed to miss work. (*Id.*) Plaintiff

5

also advised that Vellon gave Plaintiff permission to attend any appointment she needed to, so long as she documented it. (*Id.*) Plaintiff advised OSI that the anonymous complaint was Selassie retaliating against her. (*Id.*)

On December 16, 2019, the Nassau County District Attorney's Office advised Plaintiff that Selassie had pleaded guilty to stalking Plaintiff. (*Id.* ¶ 45.) The judge issued a two-year order of protection that "allowed for incidental contact related to work." (*Id.*) Plaintiff forwarded the order of protection to Vellon, OSI, and OEO, the same day. (*Id.* ¶ 46.)

On January 8, 2020, Vellon advised Plaintiff that OEO was investigating "at least some of the offenses" Selassie committed. (*Id.* ¶ 47.) Lewis led the investigation, which Plaintiff believed to be a conflict of interest because Selassie and Lewis were friends. (*Id.*) On January 29, 2020, Lewis requested to speak with Plaintiff, but Plaintiff told Lewis that she was not comfortable with Lewis leading the investigation. (*Id.* ¶ 48.) Lewis did not respond to Plaintiff or contact her again for an interview. (*Id.*) After an unspecified amount of time, Plaintiff had heard nothing about the investigation, so she emailed the Executive Director of the Borough Support Office, Marele Wilkes, to discuss it. (*Id.* ¶ 49.) Wilkes responded "[w]ho told you to contact me?" (*Id.*) The same day, Plaintiff asked Vellon how she should proceed, to which Vellon replied that he would get back to her. (*Id.* ¶ 50.) Plaintiff also advised Vellon that she had not received information concerning her certification for her position at the DOE. (*Id.*) Vellon responded that Plaintiff should have received at least two letters since September 2019. (*Id.*)

When Plaintiff received her paycheck at the end of January, Plaintiff noticed that days on which she needed to be in court or with the police had been deducted from her check. (*Id.* ¶ 51.) Plaintiff never received an explanation for the deduction despite asking the payroll secretary,

6

Vellon, and OSI. (*Id.*)

On February 27, 2020, NYCDOE's Certification Unit emailed Plaintiff advising her that because she failed to complete her master's degree, her certificate had expired and she was scheduled to be terminated. (*Id.* ¶ 52.) Plaintiff claims she was unable to complete the degree because she had been distracted by Selassie's harassment. (*Id.*) Plaintiff left a voicemail with the Certification Unit but received no response. (*Id.*)

On March 11, 2020, Plaintiff spoke with a representative in the Certification Unit, who advised that Plaintiff should be eligible for an extension, but that the final decision was to be made by Director Valerie Fallon. (*Id.* ¶ 54.) The representative advised that Plaintiff should expect a call the next day, but Plaintiff never received one. (*Id.*) On May 12, 2020, Plaintiff emailed Fallon, and Fallon responded that she would review Plaintiff's case and advise her of the decision. (*Id.* ¶ 55.)

On May 14, 2020, Plaintiff received a letter advising her that she could be terminated effective July 1, 2020, due to her failure to obtain certification. (*Id.* ¶ 56.) One week later, Plaintiff requested that Fallon grant an extension to complete her certification based upon guidelines implemented during the pandemic, which required the administration "to make decisions based on best practices to give students the best educational support[.]" (*Id.* ¶ 57.) On June 9, 2020, Fallon denied Plaintiff's request. (*Id.* ¶ 58.) On June 23, 2020, Plaintiff asked Vellon if Plaintiff could rescind her secretary resignation so that she could work as a secretary in the following school year. (*Id.* ¶ 59.) Vellon responded that Plaintiff could not because she was being terminated. (*Id.*) Vellon advised that NYCDOE may continue grace periods for employees like Plaintiff who had certification issues with good work records and tenure. (*Id.*)

On July 16, 2020, Plaintiff learned via email that she had been terminated effective July

7

1, 2020.  (*Id.* ¶ 62.)  Despite other terminated attendance teachers being reinstated after writing to the Chancellor's office, Plaintiff was not rehired when she did the same.  (*Id.* ¶ 63.)  On August 25, 2020, Plaintiff forwarded a request for reinstatement to the Deputy Chancellor for review, noting that other colleagues were rehired despite similar recertification issues.  (*Id.* ¶ 65.)  Human resources denied the request.  (*Id.*)  Plaintiff forwarded that response to the Deputy Chancellor and explained that she was prevented from completing her studies due to sexual harassment and retaliation from Selassie, but she received no response.  (*Id.* ¶ 66.)  Plaintiff learned on September 2, 2020, that Selassie remained employed by NYCDOE in the new school year.  (*Id.* ¶ 67.)

## STANDARD OF REVIEW

To withstand a Rule 12(b)(6) motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when the alleged facts allow the court to draw a "reasonable inference" of a defendant's liability for the alleged misconduct.  *Id*.  While this standard requires more than a "sheer possibility" of a defendant's liability, *id.*, "[i]t is not the Court's function to weigh the evidence that might be presented at trial" on a motion to dismiss, *Morris v. Northrop Grumman Corp.*, 37 F. Supp. 2d 556, 565 (E.D.N.Y. 1999).  Instead, "the Court must merely determine whether the complaint itself is legally sufficient, and, in doing so, it is well settled that the Court must accept the factual allegations of the complaint as true."  *Id*. (citations omitted).

## DISCUSSION

Section 1983 provides a cause of action against a "person who, under color of any statute,

8

ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Of course, § 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). Of particular relevance here, the Equal Protection Clause of the Fourteenth Amendment guarantees the right to be free from discrimination, including hostile work environments and retaliation for complaining about the same. *See Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006); *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 82 (2d Cir. 2015) ("When a supervisor retaliates against an employee because he complained of discrimination, the retaliation constitutes intentional discrimination for purposes of the Equal Protection Clause."). Accordingly, hostile work environment and retaliation claims are actionable under § 1983. *See Demoret*, 451 F.3d at 149 ("[Section] 1983 and the Equal Protection Clause protect public employees from various forms of discrimination, including hostile work environment[.]"); *Vega*, 801 F.3d at 82 ("[W]e hold that a state employee may bring a retaliation claim under § 1983 against a supervisor who, acting under color of law, retaliates against him for opposing discrimination in the terms of his employment.").

## I. *Monell* Claims Based Upon Selassie's Conduct

In her opposition to NYCDOE's motion to dismiss, Plaintiff represents that she withdraws her § 1983 claims against Selassie. (Pl.'s Opp'n to NYCDOE Mot. to Dismiss ("Pl.'s NYCDOE Opp'n") at 1 n.1, ECF No. 29.) This was for good reason as the complaint fails to sufficiently plead that Selassie's alleged actions were committed under color of state law.

"[G]enerally, a public employee acts under color of state law while acting in his official

9

capacity or while exercising his responsibilities pursuant to state law." *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 230 (2d Cir. 2004) (citing *West v. Atkins*, 487 U.S. 42, 49–50 (1988)). As such, "mere employment by the state does not mean that the employee's every act can properly be characterized as state action." *Id.* (citing *Pitchell v. Callan*, 13 F.3d 545, 548 (2d Cir. 1994)). Instead, the relevant question is whether the nature of the individual's act was that of a state actor or a private citizen. *See Pitchell*, 13 F.3d at 548. And, while an individual may be liable under § 1983 for creating a hostile work environment and retaliation, such claims "ordinarily require that the defendant be a supervisor or have some position of authority or control over the plaintiff." *Kohutka v. Town of Hempstead*, 994 F. Supp. 2d 305, 317 (E.D.N.Y. 2014) (quotations and citation omitted); *see also LaFontant v. Neale*, No. 18-CV-23, 2019 WL 1953942, at *9 (S.D.N.Y. May 2, 2019) (dismissing harassment and retaliation claims because defendant was a non-supervisory employee and plaintiff failed to otherwise plead defendant acted pursuant to state law). This is because "it is difficult to establish that the abusive action was perpetrated under color of state law rather than as an essentially private act" when the individual is merely a co-worker of the plaintiff. *Kohutka*, 994 F. Supp. 2d at 317 (quotations and citation omitted). Indeed, § 1983 hostile work environment claims against co-workers "are routinely dismissed for failure to state a claim" *Id.* (collecting cases).

      Against this backdrop, it is apparent that the amended complaint fails to state § 1983 claims for hostile work environment and retaliation against Selassie. Selassie was Plaintiff's co-worker, not her supervisor (*See* Am. Compl. ¶ 10), and there are no allegations from which the Court can infer that Selassie had any authority or control over Plaintiff's work. Further, the allegations reveal that Selassie's alleged misconduct was not "accomplished through power available to [Selassie] by virtue of [his] status as [an attendance teacher for the NYCDOE]." *See*

10

*LaFontant*, 2019 WL 1953942, at *9.  Indeed, according to the amended complaint, much of Selassie's alleged conduct occurred outside of the workplace.  Even the anonymous complaints allegedly made by Selassie did not require Selassie to be an employee of NYCDOE because the tip line was available to parents of NYCDOE students as well as employees.  (See Am. Compl. ¶ 27 (noting that a non-employee parent could have made an anonymous complaint against Plaintiff).)  At bottom, the allegations in the amended complaint fail to establish that Selassie acted under color of state law.  *See Kohutka*, 994 F. Supp. 2d at 317 (dismissing § 1983 hostile work environment and retaliation claims against defendants in their personal capacities because plaintiff "ha[d] not suggested that [defendants] held supervisory authority over her, or that [they] utilized [their] authority or position in sexually harassing her").

Notwithstanding the deficiencies with respect to the allegations against Selassie, Plaintiff persists in pursuing liability against NYCDOE for its alleged failure to appropriately respond to Selassie's misconduct.  However, *Monell v. Department of Social Services*, 436 U.S. 658 (1978) limits § 1983 liability against a municipal organization to instances "where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006).  In other words, a *Monell* claim against a government entity "must be based on an independent constitutional violation by a state actor." *See Claudio v. Sawyer*, 409 F. App'x 464, 466 (2d Cir. 2011).  As stated above, Plaintiff fails to plead any such independent violation.[2]  For this reason

---

[2] From the Court's review of Plaintiff's opposition, it appears that Plaintiff has argued her *Monell* claim as though it is a Title VII claim.  Title VII permits *respondeat superior* liability against an employer.  *See Village of Freeport v. Barrella*, 814 F.3d 594, 616 (2d Cir. 2016).  Section 1983, however, does not.  *See Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011).  Therefore, rather than attribute the individuals' actions to the NYCDOE, Plaintiff was required to establish that those individuals were acting pursuant to NYCDOE policy or that NYCDOE failed to train them.  *See Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 226 (2d Cir. 2004). ("[W]hen the defendant sued for discrimination . . . is a municipality . . . the plaintiff is required to show that the challenged acts were performed pursuant to a municipal policy or custom.").  As discussed further above, Plaintiff failed to do so.

alone, Plaintiff's *Monell* claims against NYCDOE premised upon Selassie's conduct must be dismissed.

Even if Plaintiff had sufficiently pleaded a constitutional injury by Selassie, her *Monell* claims against NYCDOE would be ripe for dismissal because she fails to sufficiently plead that NYCDOE's "official policies cause [its] employees to violate another person's constitutional rights." *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 98 (2d Cir. 2020) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988)). A policy or custom may be alleged by "identifying 1) an express policy or custom, 2) an authorization of a policymaker of the unconstitutional practice, 3) failure of the municipality to train its employees, which exhibits a 'deliberate indifference' to the rights of its citizens, or 4) a practice of the municipal employees that is 'so permanent and well settled as to imply the constructive acquiescence of senior policy-making officials.'" *Biswas v. City of New York*, 973 F. Supp. 2d 504, 536 (S.D.N.Y. 2013) (quoting *Pangburn v. Culbertson*, 200 F.3d 65, 71–72 (2d Cir. 1999)). Plaintiff maintains that the amended complaint "establishes both a practice so persistent and widespread that it constitutes a custom or policy . . . and a failure by policymakers to properly train or supervise their subordinates, amounting to deliberate indifference." (Pl.'s NYCDOE Opp'n at 3.) Plaintiff is wrong.

Plaintiff argues that the misconduct was widespread because "so many various individuals in several departments . . . were involved in the hostile work environment and/or her unlawful termination." (Pl's NYCDOE Opp'n at 4.) But, this misunderstands the widespread inquiry. "Widespread," in this context, means the unconstitutional action is "common or prevalent throughout" the NYCDOE. *See Davis v. City of New York*, 228 F. Supp. 2d 327, 346 (S.D.N.Y. 2002). Thus, the relevant question is whether sexual harassment and retaliation were

12

so widespread that NYCDOE policymakers can fairly be said to have acquiesced. *See, e.g., Miller v. Cnty. of Nassau*, 467 F. Supp. 2d 308 (E.D.N.Y. 2006) ("Plaintiffs may also demonstrate that a policy maker indirectly caused the misconduct of a subordinate municipal employee by acquiescing in a longstanding practice or custom which may fairly be said to represent official policy."). To be clear, Plaintiff does not allege that any NYCDOE employee other than Selassie sexually harassed her or retaliated against her. That multiple, non-policymaking employees of NYCDOE allegedly failed to appropriately respond to Plaintiff's complaints concerning her harassment, says nothing about whether NYCDOE acquiesced in widespread harassment and retaliation. Tellingly, the amended complaint alleges only incidents between Selassie and Plaintiff. Absent are any allegations from which the Court can infer that other women were harassed by state actors or suffered retaliation from state actors after their complaints of the same. *See Davis*, 228 F. Supp. 2d at 346 ("[T]wo incidents of unconstitutional conduct by low-level employees in a city agency with over 35,000 employees can never provide a reasonable basis for finding a widespread or well-settled custom or policy."). In short, Plaintiff's allegations are insufficient to establish a policy or custom of harassment or retaliation. *See Jackson v. Nassau Cnty.*, 552 F. Supp. 3d 350, 379–80 (E.D.N.Y. 2021) (dismissing *Monell* claim and holding no widespread conduct alleged based upon two instances of constitutional misconduct); *Tieman v. City of Newburgh*, No. 13-CV-4178, 2015 WL 1379652, at *17 (S.D.N.Y. Mar. 26, 2015) (dismissing *Monell* claim and holding no widespread conduct alleged based upon allegations from nine lawsuits over course of five years, public forum comment, and third-party report on city's constitutional misconduct).

Plaintiff likewise fails to sufficiently plead a failure to train theory of liability. Failure to train is sufficiently pleaded where a complaint contains "facts that support an inference that the

13

municipality failed to train [its employees], that it did so with deliberate indifference, and that the failure to train caused [] constitutional injuries." *Jackson*, 552 F. Supp. 3d at 378.  In other words, a plaintiff must allege "(1) the policymaker's knowledge to a moral certainty that its employees will confront a given situation; (2) a situation that either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or a history of employees mishandling the situation; and (3) that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *O'Kane v. Plainedge Union Free Sch. Dist.*, No. 16-CV-5693, 2019 WL 4575390, at *5 (E.D.N.Y. Sept. 20, 2019) (internal quotation marks and citation omitted).  Critically, a plaintiff must "identify a specific deficiency in [NYCDOE's] training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation." *Id.* (quotations and citation omitted); *Tieman*, 2015 WL 1379652 at *22 ("To allege a failure to train claim, a plaintiff must plausibly allege a specific deficiency in the municipality's training.").  Plaintiff has identified no such deficiency here.  And, to be sure, the year-long conflict between Plaintiff and Selassie, even coupled with other employees' alleged failure to appropriately respond, is insufficient to establish a failure to train.  When the government entity is large, like NYCDOE, allegations concerning a small number of employees does not create a reasonable inference that the entity fails to train. *See Simms v. City of New York*, No. 10-CV-3420, 2011 WL 4543051, at *3 (E.D.N.Y. Sept. 28, 2011), *aff'd*, 480 F. App'x 627 (2d Cir. 2012) (rejecting failure to train claim premised upon plaintiff's experiencing same constitutional violation multiple times, in part, due to size of police department).[3]

## II. *Monell* Claims Based Upon Denial of Certification and Termination

---

[3] Of course, Plaintiff's failure to sufficiently allege a constitutional injury by a state actor is independently fatal to Plaintiff's failure to train claim. *See Claudio v. Sawyer*, 409 F. App'x 464, 466 (2d Cir. 2011).

14

Dismissal of Plaintiff's claims premised upon Selassie's conduct leaves only a potential retaliation claim against NYCDOE premised upon Fallon's decision not to grant Plaintiff an extension for her certification, effectively terminating her employment. NYCDOE argues that Plaintiff has failed to establish that Fallon was a policymaker. (Reply in Further Supp. NYCDOE Mot. to Dismiss ("NYCDOE Reply") at 4, ECF No. 30.) The Court agrees. A government entity "may be liable for the acts of a single official—but only if that official is someone 'whose edicts or acts may fairly be said to represent official policy'" for the government entity as a whole. *Agosto*, 982 F.3d at 98 (quoting *Monell*, 436 U.S. at 694). That an official has authority to make an unreviewable decision is insufficient to make that official a policymaker. *Id.* Instead, the official "must have been sufficiently high up in the municipal hierarchy [] that [she] was responsible under state law for making policy in that area of the municipality's business." *Id*. (internal quotation marks and citations omitted). Whether an official possesses final policymaking authority "is a legal question, which is to be answered on the basis of state law." *Id.* (citation omitted). Here, Plaintiff provides no state law indicating that the Director of the Certification Unit of the NYCDOE is a final policymaker. To the contrary, the New York state education commissioner is the final policymaker concerning certification because New York law provides that "[t]he commissioner shall prescribe, subject to approval by the regents, regulations governing the examination and certification of teachers employed in all public schools of the state[.]" N.Y. Educ. Law § 3004(1); *see also* § 3006 (granting authority to commissioner to issue specified types of certificates including "[s]uch other certificates as regents general rules shall prescribe."). And, to the extent that the complaint can be read to allege that the decision to terminate her employment based on Plaintiff's lack of certification was retaliatory, the complaint fails to identify the individual responsible for that

15

decision. Therefore, because Plaintiff has failed to allege that a final policymaker was involved in the denial of the extension for Plaintiff's teacher certification, or to identify the individual who made the determination to terminate Plaintiff's employment, Plaintiff's *Monell* retaliation claim on these facts must be dismissed.

### III. Plaintiff's State Law Claims Against Selassie and NYCDOE

Having dismissed Plaintiff's federal claims, the Court must consider whether to retain jurisdiction over Plaintiff's state law claims. "Although the dismissal of state law claims is not required when the federal claims in an action are dismissed, a federal court may decline to exercise supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(c)(3)." *Reid ex rel. Roz B. v. Freeport Pub. Sch. Dist.*, 89 F. Supp. 3d 450, 459 (E.D.N.Y. 2015) (quoting *Eskenazi-McGibney v. Connetquot Cent. Sch. Dist.*, 84 F. Supp. 3d 221, 237 (E.D.N.Y. 2015)). The Court must "consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over pendent state law claims." *Id.* at 461 (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)). "Once all federal claims have been dismissed, the balance of factors will 'usual[ly]' point toward a declination" of supplemental jurisdiction. *Lundy v. Catholic Health Sys. Long Island*, 711 F.3d 106, 118 (2d Cir. 2013). Having considered judicial economy, convenience, fairness, and comity, the Court declines to exercise supplemental jurisdiction. Accordingly, Plaintiff's state law claims against NYCDOE and Selassie are dismissed.

### CONCLUSION

For the foregoing reasons, NYCDOE's motion to dismiss is GRANTED as to Plaintiff's § 1983 claims. The amended complaint is dismissed in its entirety. Selassie's motion to dismiss

Plaintiff's state law claims is DENIED as moot.

                                                          SO ORDERED.

Dated: Brooklyn, New York                   /s/ LDH
       March 28, 2023                        L<small>A</small>SHANN D<small>E</small>ARCY HALL
                                                        United States District Judge